STATE OF WISCONSIN      CIRCUIT COURT      MILWAUKEE COUNTY

MARLEEN M. LAPLANT, on her own behalf
and on behalf of a class similarly situated,

                              Plaintiffs,

                vs.

THE   NORTHWESTERN   MUTUAL   LIFE
INSURANCE COMPANY, a Wisconsin
mutual insurance corporation,

                         Defendant.

Case No.    08-CV-11988

Code:       30701
Declaratory Judgment

---

## DECLARATORY JUDGMENT

This action came on for trial to the court November 8, 2010, all parties having waived a jury. The court has heard the testimony, examined the proofs and considered the post-trial submissions of the parties, made its findings of fact and conclusions of law, rendered its decision that the plaintiff and the plaintiff class are entitled to declaratory relief, and directed that judgment be entered in accordance therewith. Now therefore,

IT IS ORDERED, ADJUDGED AND DECLARED as follows:

### GENERAL DECLARATIONS

1.   The findings of fact and conclusions of law made by the court on this date are incorporated by reference here and made a part of this judgment.

PLAINTIFF'S EXHIBIT

2.  As a mutual insurance company organized under the laws of Wisconsin and domiciled and headquartered in Wisconsin, the actions of the defendant The Northwestern Mutual Life Insurance Company ("Northwestern" or the "Company") are subject to Wisconsin Stats. § 632.62 and the other laws of Wisconsin with respect to the annual determination, allocation and payment through dividends of its divisible surplus to its participating policyholders.

3.  The class members' annuity contracts with Northwestern (the "Annuities") are participating contracts and Annuity policyholders (the "Annuitants") are owners of Northwestern.

4.  The terms of Wisconsin Stats. § 632.62 are incorporated into the Annuities and require Northwestern annually to first determine the divisible surplus, equitably apportion its divisible surplus among the policyholders and then credit to each Annuitant an equitable share of that divisible surplus.

5.  Under their participating Annuities, Annuitants had and have a full right to receive dividends genuinely based on the Company's annual divisible surplus during the deferral period of the Annuities they own or owned at any time on or after March 1, 1985.

6.   Northwestern owed and owes class members the contractual duty of good faith and fair dealing in performing its duties under the Annuity contracts.

7.   At all relevant times Northwestern owed and owes a fiduciary duty to the class members with respect to their dividend rights under the Annuity contracts.

8.   At all relevant times the Northwestern officers and trustees involved in the 1985 Change owed and owe fiduciary duties to the Annuitants with respect to dividend rights under the Annuity contracts, and Northwestern is liable for the breach by those officers and trustees of their fiduciary duties to the class members.

9.   The conduct complained of in this case arises from Northwestern's creation of a segmented asset account for the Annuities in 1985 and thereafter annually basing the Annuity dividends on the yield of that account (the "1985 Change").

10.   On March 1, 1985, Northwestern discontinued selling Annuities and they became a "closed block" of policies. The 1985 Change and related conduct of Northwestern complained of in this case were done as to that block of Annuities as a whole.

11.    As of March 1, 1985, there were 35,261 Annuities in the block.  Of those, 3,644 Annuities were issued in Wisconsin.

## DECLARATIONS REGARDING NORTHWESTERN'S BREACH OF THE ANNUITY CONTRACTS

12.    By basing Annuity dividends each year since 1985 on the interest earned by the segmented account created for the Annuities in the 1985 Change, rather than on the Company's general account portfolio of investments, Northwestern breached its contractual duties to determine, allocate and credit to the Annuitants their equitable and proper share of the Company's divisible surplus required by the Annuity contracts.

13.    The Annuities' express language, implied duties of good faith and fair dealing and incorporated statutory provisions did not permit the 1985 Change or the annual dividend determinations made by Northwestern pursuant to the 1985 Change.

14.    Since 1985 and pursuant to the 1985 Change, Northwestern has determined Annuity dividends before and independent of the determination of its surplus and divisible surplus, in violation of Wisconsin Stats. §632.62.

15.    Since 1985 Annuity dividends have borne no true relationship to Northwestern's determinations of its surplus and divisible surplus, in violation of Wisconsin Stats. §632.62.

4

16.   In making the 1985 Change and the annual dividend determinations based on that Change, Northwestern has infringed upon and injured the Annuitants' full right under the Annuity contracts to share in Northwestern's divisible surplus.

17.   Since 1985 the Annuitants have not received an equitable share of Northwestern's divisible surplus as dividends.

18.   Northwestern has breached the terms of the Annuity contracts each year since 1985 by basing dividends on the yield of a segmented account rather than on the divisible surplus of the Company.

19.   Northwestern breached its implied contractual duties of good faith and fair dealing in the following respects:

(a)   Adopting and implementing the 1985 Change for the purpose of enhancing the marketability of its new CRA at the expense of the existing Annuitants;

(b)   Failing to obtain the informed written consent of Annuitants to the 1985 Change;

(c)   Failing to provide Annuitants with direct notice and explanation of the 1985 Change;

(d)   Adopting a so-called "soft landing" to phase in the 1985 Change over several years so as to conceal from Annuitants the new

5

method for determining their dividends and the adverse economic effects likely to result from Northwestern's failure to pay dividends based on their equitable share of the divisible surplus of the company;

(e)  Failing in each year since 1985 to pay dividends based on the company's divisible surplus, as promised in the contracts, without the knowledge and consent of the Annuitants;

(f)  Making the 1985 Change which materially injured the Annuitants' right to receive the benefits of the contract;

(g)  Crediting dividends pursuant to the 1985 Change which did not meet the reasonable expectations which an ordinary, reasonable and prudent Annuitant would have had as of the time the Annuity agreement was made.

## BREACH OF FIDUCIARY DUTY BY NORTHWESTERN AND ITS OFFICERS AND TRUSTEES

20.    Northwestern breached its fiduciary duties to the Annuitants in the following respects:

(a)  Intentionally failing to disclose material information relevant to the Annuitants' rights, including particularly the failure to disclose the 1985 Change and its potential effects on their dividends;

(b)   Actively and intentionally acting to minimize (or eliminate) the possibility that Annuitants would learn of the 1985 Change and its effects;

(c)   Intentionally failing to act in the Annuitants' best interests in making the 1985 Change;

(d)   Intentionally placing its own economic interest in marketing the CRAs ahead of interests of the Annuitants in making the 1985 Change;

(e)   Making dishonest and misleading statements in and after 1985 with respect to Northwestern's continuing strategy of balanced, diversified, long-term investments, when in fact it had switched the basis for Pre-MN Annuity dividends to a relatively short-term oriented portfolio of debt investments;

(f)   Acting inequitably against the Pre-MN Annuitants both in the process by which it adopted and implemented the 1985 Change and in the determination annually thereafter of the Annuitants' dividends based on the Change.

21.   Each of Northwestern's breaches of fiduciary duties was done in an intentional disregard of the rights of the Pre-MN Annuitants within the meaning of Wisconsin Stats. §895.043(3).

7

22.   The Northwestern officers and trustees involved in the 1985 Change breached their fiduciary duties to the Annuitants in authorizing and making the 1985 Change and in determining dividends annually thereafter based on the 1985 Change, for which conduct Northwestern is vicariously liable.

23.   Each of the breaches of fiduciary duties by the Northwestern officers and trustees referred to in paragraph 22 above was done in an intentional disregard of the rights of the Pre-MN Annuitants within the meaning of Wisconsin Stats. §895.043(3).

## IMPACT AND CAUSATION

24.   By virtue of Northwestern's breaches of the Annuity contracts and as a proximate result of Northwestern's breaches of its fiduciary duties and of the breaches by its officers and trustees for which Northwestern is vicariously liable, and each of them, the Annuitants' rights were materially and substantially infringed upon and the Annuitants sustained financial injury.

## OTHER DECLARATIONS

25.   The business judgment rule is not available to Northwestern for each of the following reasons:

8

(a)   The rule is irrelevant to Northwestern's failure to comply with its contractual and statutory duties in regard to its annual determination of surplus and divisible surplus, and then equitably apportioning that divisible surplus among its participating policyholders;

(b)   Northwestern failed to act in good faith toward and to deal fairly with the Annuitants;

(c)   Northwestern did not act equitably toward the Annuitants;

(d)   Northwestern and its officers and trustees involved in the 1985 Change breached their fiduciary duties to the Annuitants in connection with the 1985 Change and the dividend determinations made pursuant to that Change.

26.   Pursuant to § 806.04 (8), Wisconsin Stats., and until further order, the court retains jurisdiction for the purpose of considering such further and supplemental relief as may be necessary or proper.

Signed this _____ day of _____, 2011.

BY THE COURT:

_____

The Honorable Dennis J. Flynn
Reserve Circuit Judge

9

Contains Confidential Information

LaPlant Trial
Exhibit 405

# TOTAL NUMBER OF PRE-MN ANNUITIES
# IN FORCE NATIONWIDE

| Year | Total Number of Pre-MN Participating Policies In Force at End of Each Respective Year |
|------|------|
| 1985 | 35,261 |
| 1986 | 32,336 |
| 1987 | 29,781 |
| 1988 | 27,780 |
| 1989 | 25,839 |
| 1990 | 24,094 |
| 1991 | 22,675 |
| 1992 | 21,420 |
| 1993 | 20,281 |
| 1994 | 19,082 |
| 1995 | 17,778 |
| 1996 | 16,364 |
| 1997 | 14,825 |
| 1998 | 13,351 |
| 1999 | 12,203 |
| 2000 | 11,105 |
| 2001 | 10,398 |
| 2002 | 9,759 |
| 2003 | 9,228 |



PLAINTIFF'S EXHIBIT D



**Quarles & Brady** LLP

411 East Wisconsin Avenue
Milwaukee, Wisconsin 53202-4497
Tel 414.277.5000
Fax 414.271.3552
www.quarles.com

*Attorneys at Law in:*
*Phoenix and Tucson, Arizona*
*Naples, Florida*
*Chicago, Illinois*
*Milwaukee and Madison, Wisconsin*

Direct Dial: (414) 277-5625
Direct Fax: (414) 978-8625
E-Mail: eric.vanvugt@quarles.com

January 3, 2011

**VIA REGULAR MAIL & E-MAIL**
**[george@kerstenlaw.com]**

George Kersten, Esq.
Kersten & McKinnon, S.C.
11518 N. Port Washington Road, Suite 104
Mequon, WI  53092

      RE:    **Krueger v. The Northwestern Mutual Life Insurance Company**
                **Case No. 1:10-CV-00128-SPM**

Dear George:

        In response to your letter and Notice of Deposition dated December 28, 2010, we are producing the attached listing of the number of inforce annuities within the scope of paragraph 15.(A.)(a) and (b) of the Complaint in the above matter.  We have not determined how many, if any, of these annuities would fall within the description of paragraph 15.(A.)(c) and the exclusion applicable to Northwestern's officers, trustees, employees, family members or affiliates.

        I believe this provides the information you requested and cancels the Rule 30(b)(6) deposition notice for tomorrow.

                Sincerely,

                QUARLES & BRADY LLP

                Eric J. Van Vugt

EJV:ksm
Enclosure

PLAINTIFF'S EXHIBIT
E

**Inforce Policies  As Of:**

| End of Month | Number of Inforce Policies |
|---|---|
| Mar 1985 | 912 |
| Dec 1985 | 869 |
| Dec 1986 | 803 |
| Dec 1987 | 736 |
| Dec 1988 | 686 |
| Dec 1989 | 629 |
| Dec 1990 | 595 |
| Dec 1991 | 571 |
| Dec 1992 | 550 |
| Dec 1993 | 531 |
| Dec 1994 | 508 |
| Dec 1995 | 486 |
| Dec 1996 | 452 |
| Dec 1997 | 433 |
| Dec 1998 | 400 |
| Dec 1999 | 372 |
| Dec 2000 | 353 |
| Dec 2001 | 330 |
| Dec 2002 | 311 |
| Dec 2003 | 294 |
| Dec 2004 | 290 |
| Dec 2005 | 285 |
| Dec 2006 | 272 |
| Dec 2007 | 257 |
| Dec 2008 | 253 |
| Dec 2009 | 244 |
| Nov 2010 | 240 |



1   STATE OF WISCONSIN       CIRCUIT COURT     MILWAUKEE COUNTY

2                               Branch 36

3   ────────────────────────────────────────────────────────

4   MARLEEN M. LA PLANT,

5                   Plaintiff,

6           -vs-                        Case No. 08CV011988

7

8   NORTHWESTERN MUTUAL LIFE INSURANCE

9   COMPANY,

10                  Defendant.

11  ────────────────────────────────────────────────────────

12                          COURT TRIAL

13  ────────────────────────────────────────────────────────

14  November 10, 2010 (a.m.)        Dennis J. Flynn
                                    Reserve Judge Presiding
15

16

17  APPEARANCES:

18        Kersten & McKinnon by George P. Kersten, E. Campion

19     Kersten and Kenan J. Kersten, Attorneys at Law, appeared on

20     behalf of the plaintiff.

21        Quarles & Brady by Eric M. VanVugt and Cristina D.

22     Hernandez, Attorneys at Law, appeared on behalf of the

23     Defendant.

24

25  Leposava Munns, Official Court Reporter



COPY

```
 1        the use of Mr. Murphy and that one-half hour might be all I
 2        need to complete getting everything organized.  I don't like
 3        to have delay once we start.
 4                 THE COURT:  All right, I hear what you say.  We'll
 5        accommodate the attorneys.  Anything more from the defense
 6        side?
 7                 MR. VAN VUGT:  No, Your Honor.
 8                 THE COURT:  All right.  We'll proceed, then, with
 9        whoever the next witness is, and when we finish Messrs Zore
10        and Murphy we'll then go back to the Durland matter.
11        Counsel?
12                 MR. KERSTEN:  I assume also, Your Honor, at some
13        point we can then --we would agree on the Fisher exhibits so
14        we can at some point make a record on that.
15                 THE COURT:  Absolutely.
16                 MR. KERSTEN:  Fine.  Your Honor, the plaintiff and
17        Class call Edward Zore.
18                 THE CLERK:  Sir, please remain standing and raise
19        your right hand.
20                 EDWARD ZORE, having been duly sworn,
21                     under oath testified as follows:
22                 THE WITNESS:  I do.
23                 THE CLERK:  You may be seated.  Sir, now state
24        your name for the record and please spell your last name.
25                 THE WITNESS:  My name is Edward J. Zore.  Z-O-R-E.
```

```
 1                      DIRECT EXAMINATION
 2   BY MR. KERSTEN:
 3   Q    Mr. Zore, what is your home address?
 4   A    2505 West Dean, D-E-A-N Road.
 5                 THE COURT:  This happened with each of the
 6        witnesses.  Unless there is a reason for the personal
 7        address of a witness I see no reason for a witness giving
 8        his or her personal address.
 9                 If this is a business matter --there's just been
10        issues over time, it's a privacy issue --if you have a
11        reason for it in the context of the dispute go for it, but
12        if it's just spreading information out there I don't think a
13        witness who's forced to come into court for either side
14        should have to disgorge personal data that has nothing to do
15        with the dispute.
16                 Counsel, please proceed, and same for defense
17        side.  Unless there's a reason for it I don't want that
18        personal information in the record.
19   BY MR. KERSTEN:
20   Q    What is your occupation?
21   A    I'm retired.
22   Q    How long have you been retired?
23   A    Since July of this year.
24   Q    Of this present year.  Prior to your retirement what was
25        your occupation?
```

6

1   A   I was chairman and CEO of Northwestern Mutual.

2   Q   That's the defendant, Northwestern Mutual Life Insurance

3       Company?

4   A   Yes.

5   Q   Northwestern Mutual Life Insurance Company is a mutual

6       insurance company, is it not?

7   A   That is correct.

8   Q   It is organized under the laws of the State of Wisconsin?

9   A   Yes.

10  Q   And it is domiciled and headquartered in Wisconsin and

11      specifically in Milwaukee; is that correct?

12  A   Yes.

13  Q   How long were you chairman and CEO?

14  A   I was chairman and CEO for two months.  Before that I was

15      president and CEO since 2001.

16  Q   What was your position at Northwestern Mutual as of the

17      early 1980's?  Let's say 1982.

18  A   1982.  At some point in 1982 --I don't know the exact date -

19      -I was made vice president and treasurer.

20  Q   What was your special area of concentration in terms of your

21      work at Northwestern in those days in terms of your day-to-

22      day employment there?

23  A   I was responsible for marketing fixed income investments and

24      treasury operations which included cash management, bank

25      relationships, liquidity management, things like that.

1    take the slice, you say we need a lower rate environment to

2    make this transition, why did you say that?

3  A  Because then we would bring the assets into a lineup with

4    the market values.

5  Q  Because that's the same financial dynamic, is it not, that

6    you testified to in just the preceding questions; namely, if

7    instead of going up market rates go down then the market

8    value of your long term debt instruments tends to come up

9    again?

10 A  Yes.

11 Q  Would you go to the next exhibit, Exhibit 26.  What was Mr.

12    Jensen as of that --what was Mr. Jensen's position as of

13    July 13, 1984?

14 A  I think he was the head of corporate planning.

15 Q  I'm sorry?

16 A  The head of corporate planning.

17 Q  And did you regard Mr. Jensen as a talented and accomplished

18    executive?

19 A  Yes.

20 Q  And of course he was a very senior person with the title

21    you've just given him as of that time, correct?

22 A  I believe so, yes.

23 Q  Okay.  And he offers this memorandum as of July, 1984,

24    regarding the CRA directed to Messrs Carlson, Ericson and

25    Wright.  They are, of course, obviously senior executives, a

```
 1        copy to you and Mr. Murphy.  Do you see that?
 2   A    Yes.
 3   Q    First in the second paragraph he says "the first question
 4        is, colon."  Would you read that?
 5   A    The first question, is management committed to a CRA-based,
 6        on a segregated set of assets and crediting the current,
 7        quote, current rate:  Here I believe the answer is definite
 8        and affirmative.  Thus, we can safely proceed as above.
 9   Q    Now, apparently as of this point the management was
10        committed to the CRA which if issued then and launched would
11        get Northwestern into that current rate market?
12   A    Yes.
13   Q    Was it your understanding as you participated in this
14        project that the field force wanted something to sell along
15        that line?
16   A    Definitely.
17   Q    And the company did?
18   A    Yes.
19   Q    Would you go on then and read the next paragraph starting
20        with "what."
21   A    But what set of assets and how does that work.  What
22        treatment is to be given to the in-force business?  What are
23        the risks of various kinds?  This is the subject for I and A
24        in late August.
25   Q    What is I and A?
```

```
 1   A   That's a committee, insurance and agency.
 2   Q   Okay, so he thought that there should be an actual meeting
 3       on those very questions by late August, right?
 4   A   Apparently.
 5   Q   And then it starts out the next paragraph "as I see it this
 6       should be brought along under Ed Zore's leadership."  Do you
 7       see that?
 8   A   Yes.
 9   Q   And that in fact occurred, didn't it?
10   A   Yes.
11   Q   Would you go to the next paragraph, the next document, next
12       exhibit, Exhibit 27.  You authored that document, did you
13       not?
14   A   Yes, I did.
15   Q   And you addressed it to the same Russell Jensen as well as
16       to Jim Ericson, Dick Wright and Bob Carlson.  Just give me
17       the offices that each of those --Mr. Jensen, in other words,
18       each of the others held as of that time to your best
19       recollection.
20   A   That's correct.
21   Q   What were the positions of Ericson, Wright and Carlson at
22       that point?
23   A   Jim Ericson I believe in 1984 was chief investment officer.
24       Dick Wright was chief operating officer and Bob Carlson was
25       chief marketing officer.
```

41

```
 1   Q   So they were certainly senior people?

 2   A   Yes.

 3   Q   Okay.  Now, in this memorandum you indicate that you're

 4       responding to Russ Jensen's recent memo.  Would that be the

 5       one I just asked you to read from?

 6   A   Yes.

 7   Q   And you give them kind of an interim progress report in this

 8       memo, don't you?

 9   A   I believe so, yes.

10   Q   And first of all you talk about the --being committed,

11       whether you're committed to the CRA product, and toward the

12       end of that second paragraph, the longer paragraph on the

13       page do you see a sentence about six up from the bottom that

14       begins "the assets that we manage would be segmented?"

15   A   Yes.

16   Q   Would you read from there to the end of that?

17   A   The assets that we manage would be segmented from the

18       general account portfolio but not necessarily in a separate

19       account.  We would keep track of these assets on a HW and

20       would manage from them from the PC.  Our statements would

21       still show a general account portfolio, but internally

22       Northwestern Mutual would really be looking at two

23       portfolios.  This is all pretty easy from an investment

24       standpoint.

25   Q   In a technical or statutory sense the phrase "separate
```

42

| | | |
|---|---|---|
| 1 | | account" has a very specific meaning, does it not? |
| 2 | A | Yes. |
| 3 | Q | And that would mean it's in effect almost a separate |
| 4 | | business in the sense that that account supports a |
| 5 | | particular product.  An example might be a variable annuity? |
| 6 | A | Yes, those are separate accounts. |
| 7 | Q | Yeah, and they have a special statutory framework, do they |
| 8 | | not? |
| 9 | A | Yes. |
| 10 | Q | And we are not dealing with the special --the separate |
| 11 | | account in that statutory sense here, are we, with pre-MN or |
| 12 | | the CRA? |
| 13 | A | Correct. |
| 14 | Q | Okay.  So when you use the word as you did here "separate |
| 15 | | account," if that shows up in some of the other descriptions |
| 16 | | of the CRA "separate account" in that context is a more |
| 17 | | informal use of that phrase? |
| 18 | A | Right. |
| 19 | Q | The fact was, however, that you understood that --and it's |
| 20 | | also been called a segmented account.   Internally |
| 21 | | Northwestern is really looking at two portfolios, isn't it? |
| 22 | A | I believe we have a number of portfolios but yes, we have. |
| 23 | | We have different portfolios within the general account to |
| 24 | | do different jobs. |
| 25 | Q | Okay.  Now, would you read the next paragraph into the |

| | | |
|---|---|---|
| 1 | | record.  You may as well read the whole first sentence |
| 2 | | first, then read it sentence by sentence.  I'll have |
| 3 | | questions on it. |
| 4 | A | The real problem is with the current FPA. |
| 5 | Q | I'll just --after each sentence I'll ask you a question.  It |
| 6 | | might be quicker to do it that way.  There you're talking |
| 7 | | about the pre-MN annuities there, "the real problem" you |
| 8 | | say? |
| 9 | A | In this design, yes. |
| 10 | Q | Okay.  Take the next sentence. |
| 11 | A | We currently pay a dividend based on the general account |
| 12 | | portfolio. |
| 13 | Q | Was that correct? |
| 14 | A | That was correct. |
| 15 | Q | Did you understand that at this time the --these products |
| 16 | | were generally sold by the use of illustrations? |
| 17 | A | No.  At this point in time I didn't know how they were sold. |
| 18 | Q | Didn't you know that Northwestern typically provided its |
| 19 | | field force with illustrations to be used in the -- |
| 20 | A | --We provided illustrations and they showed at a point in |
| 21 | | time what was happening in the --in the product --but I |
| 22 | | don't know exactly how these products were sold at that |
| 23 | | point in time. |
| 24 | Q | By "the illustrations" you mean illustrations of dividends? |
| 25 | A | Illustrations of how the product works. |

44

```
 1   Q   And that would include a description of dividends, correct?
 2   A   Yes.
 3   Q   Including dividends to be earned in the future, assuming the
 4       current rate of dividends?
 5   A   Assuming nothing changes.
 6   Q   And those illustrations you knew were generated by
 7       Northwestern, weren't they?
 8   A   They were generated by Northwestern and the illustrations,
 9       sure.
10   Q   Now, didn't you know at this time that they were being --
11       those illustrations were being used in the sale of these
12       annuities?
13   A   At this time I was in charge of an investment division at
14       Northwestern Mutual.  I was working on solving an investment
15       problem for a product.  I was not involved in selling
16       products, I was not involved in designing sales literature,
17       I was not involved in any of that.  I was --I was
18       technically working on this, so specifically to answer your
19       question at that point in time I was not aware of how these
20       products were sold.  All I was aware of was how they were
21       structured and what they were doing.
22   Q   We'll return to that question a little later.  Let's carry
23       on with this paragraph for now.
24                You say recently --that refers to the general
25       account portfolio --has been about right on the market, but
```

45

1      if interest rates go up or down it will be a lot different

2      than the new CRA.  Do you see that?

3  A   Yes.

4  Q   Then you say, quote, we can't have the old FPA and the new

5      CRA running side by side so the old FPA has to be made to

6      look like the new CRA even though the contract language

7      might be different.  Do you see that sentence?

8  A   Yes.

9  Q   Have I read it correctly?

10  A   Yes, you did.

11  Q   You wrote it that way, didn't you?

12  A   I believe so.

13  Q   Now, I imagine you studied this paragraph, this sentence in

14      connection with this trial, have you not?

15  A   Yes.

16  Q   By that phrase "the old FPA has to be made to look like the

17      new CRA" you meant, did you not, that the financial

18      performance of that existing book of annuities, the old FPA,

19      had to be made like the new CRA.

20  A   Had to be brought more into alignment with the new product

21      and what was going on in the marketplace because of the

22      characteristics of the product and the way the old CRA was

23      actually performing.

24  Q   In effect you wanted to make the FPA a CRA type product so

25      far as its financial performance was concerned?

46

```
 1  A    We wanted to make it a little different than what it was to
 2       be more compatible with the CRA.
 3  Q    Yes or no, Mr. Zore, did you not want to make the old FPA;
 4       that is, the existing type of annuity have the same
 5       performance as a current rate annuity?
 6  A    No.
 7  Q    Explain why you could not have the old FPA and the new CRA
 8       running side by side.
 9  A    We have had a history with the old FPA of people electing to
10       take their money out, putting it to products that were
11       similar to a new CRA.  In a very volatile market we had an
12       extraordinary amount of disintermediation, surrenders in the
13       product.  If we came out with a new product that was like a
14       competitive product in the marketplace and we had an old CRA
15       that sometimes was better, sometimes was worse.
16            It would be --it would be disruptive to the
17       performance of all the policy owners as folks would switch
18       from one to another, inappropriate times for themselves and
19       for the company.  It just was not sound business.  People
20       were looking for a more, say, contemporary type of
21       investment portfolio --not portfolio but product that would
22       provide them with rates that were competitive in the
23       marketplace.
24  Q    Are you saying that launching this CRA with the FPA running
25       side by side would create disintermediation itself within
```

47

```
 1        the company?

 2   A    It might do that under certain circumstances.

 3   Q    Is that what you're talking disintermediation?  What do you

 4        mean by that?

 5   A    People taking money out of one product and putting it into

 6        another product either directly or indirectly.

 7   Q    So an example --strike that.  I believe one of the earlier

 8        witnesses has referred to that as flip-flopping between the

 9        two products that would be disadvantageous to the company.

10   A    It would be disadvantageous to the policy owners.

11   Q    And Northwestern could sustain losses by virtue of that

12        flip-flopping?

13   A    Policy owners would sustain losses.

14   Q    Wouldn't Northwestern Mutual Life Insurance Company sustain

15        loses with such flip-flopping?  Wouldn't it, yes or no?

16   A    The policy owners would, yes.

17   Q    Yes or no, would Northwestern Mutual Life Insurance Company

18        sustain losses, Mr. Zore?

19   A    The company, the policy owners would sustain losses, yes.

20   Q    Sir, are you --you keep inserting "policy holders."  I

21        understand your argument.

22   A    Why separate them?

23   Q    Answer this question yes or no.  With the flip-flopping that

24        you've described and I mentioned another witness has

25        described it, yes or no, would Northwestern Mutual Life
```

```
 1        Insurance Company sustain losses?
 2   A    With the background I said yes.
 3   Q    Now, Mr. Zore, nevertheless you had committed and definitely
 4        wanted to launch the CRA; isn't that right?
 5   A    Yes.
 6   Q    So what you're saying was having the FPA running as it was
 7        side by side as a portfolio-based product was a barrier to
 8        successful launch of the CRA?
 9   A    I don't know if it was a barrier to the successful launch.
10   Q    Was a disadvantage created by launching the CRA?  That's
11        what you're saying, they can't be side by side?
12   A    It would have created some problems that we just discussed.
13   Q    That's what you're referring to here in the first sentence
14        of this paragraph that's the real problem in this whole
15        picture is the FPA being there when you want to launch a
16        CRA; isn't that correct?
17   A    Yes.
18   Q    And you did want to launch the CRA, didn't you?
19   A    Yes, we did.
20   Q    In fact, Northwestern senior management by that point was
21        committed, wasn't it?  That's what Mr. Jensen said?
22   A    Well, as I read this memo I said but I haven't heard anybody
23        officially say yes around Don Schuenke, because I do not
24        believe it had been decided yet at that point in time.
25   Q    But in fact Russell Jensen said the answer he believed was a
```

1    definite and affirmative yes, correct?  That's what he told

2    you?

3  A  That's what Russ Jensen said but that's not what this memo

4    said.

5  Q  And certainly became a definite decision to launch the CRA,

6    right, at this very time, did it not?  That was what you

7    were working on?

8  A  Subsequent to this I believe that was the case, but at this

9    point in time Don Schuenke and the board had not approved

10   it.

11 Q  It had not been approved but senior management had given a

12   definite green light and through that time it eventuated in

13   the actual launching of the CRA?

14 A  Yes.

15 Q  And one of your jobs at least in connection with this was to

16   try to solve the real problem that would stand in the way of

17   that launch; namely, handling this existing book of

18   business, correct?

19 A  That was one of the issues we had to address.

20 Q  With regard to the next Exhibit 151, do you see that as a

21   July --minutes of a July 22 planning committee meeting?

22 A  We're going back in time?  This is 1982.

23 Q  Oh, I'm sorry, I had this out of order.  We are going back

24   in time and I wanted to ask you about this.  This shows that

25   you were an addressee back in 1982 of this memorandum.

```
 1  A   My name is on the list, yes.

 2  Q   Yes, and what was the planning committee as of 1982?

 3  A   It was probably a committee that did planning on products

 4      and other things.

 5  Q   That is from the people that are described as present at

 6      that meeting.  That includes senior management all the way

 7      up to and including Francis Ferguson, Donald Schuenke, James

 8      Ericson and yourself as well as others, right?

 9  A   Yes, um-hum, yes.

10  Q   And this dealt with the development of the CRA and also

11      raised the question about what to do about the old business.

12  A   I haven't read this but --

13  Q   I'll just invite your attention to the first paragraph.

14  A   Okay.

15  Q   Now, does this refresh your recollection perhaps that

16      actually you were familiar with the fact that the CRA that

17      ultimately became called a CRA product was being developed

18      from that point forward?

19  A   Well, it was being developed but I didn't know the details.

20      I told you that earlier.  I did not know the details of what

21      was being developed but I did know what was going on with

22      the existing portfolio with lapses and surrenders and I did

23      know what was going on in the marketplace.

24  Q   Did you know that a product was trying to be developed to

25      try to meet those problems, a product ultimately known as
```

```
 1        the CRA?
 2   A    They were working on the product, yes.
 3   Q    You were aware of that committee too, forward?
 4   A    I believe so.
 5   Q    Now, let's return to 1984.  It's the Jensen memo that is
 6        Exhibit 28.  That is a memo of Mr. Jensen to Messrs Carlson,
 7        Ericson, Wright and you.
 8   A    Where are we?  I'm sorry.
 9   Q    Exhibit 28.
10   A    These are out of order.  Okay.
11   Q    Have you got it?
12   A    Yes.
13   Q    That's a one-page memo by Mr. Jensen to Messrs Carlson,
14        Ericson, Wright and you, right?
15   A    Yes.
16   Q    Dated July 18, 1984 regarding the current rate annuity.  Do
17        you see that?
18   A    Yes, yes.
19   Q    And he refers right at the very start to the memo that you
20        authored that I've just been asking about, your July 16
21        memo, right?
22   A    That's correct.
23   Q    He then addresses some questions, and in the third paragraph
24        --just read that third paragraph that starts "there is a
25        question."
```

52

1  A   There is a question of whether it is legal to convert to the
2      present FPA's over to a sort of --the present FPA's over to
3      a sort of CRA-type dividend interest rate or the terms on
4      which it would be legal to do so.  To the nice question of
5      "legal" we might add "wise."
6  Q   And then read the next paragraph if you would.
7  A   It isn't certain that interest rates will always be higher.
8      There's a real risk of deflation, default and gradual long
9      decline in interest rates.  If this happens precipitately
10     following a unilateral dividend action policy owners would
11     have a course of action if not action, at least of unction
12     (sober and fervid emotion.)
13 Q   Now, you received this memorandum?
14 A   Apparently I did, yes.
15 Q   Did you ask Mr. Jensen what he meant by it?
16 A   I can't remember.
17 Q   Did you --strike that.  Do you agree that as of that time
18     there was a real risk of deflation, default and gradual long
19     decline in interest rates?
20 A   There's always a risk of inflation, deflation, decline or
21     increase in interest rates.  There's always a risk in the
22     investment world, so I mean I don't know what the
23     probabilities with me going through 15 years of
24     substantially erratic and increasing interest rates and
25     investment returns that were very, very volatile.

1    work behind this.  This is a 1991, I believe, but we have a

2    portfolio that was rolling over and so the investment were

3    -- investment returns were coming down for everything.

4  Q  Well, as part of the management committee what did you take

5    this to mean:  With the segmentation adjustment ending, in

6    order to avoid a drop there wasn't that --the reason that

7    you were starting kind of a soft landing process right here

8    so that when the segmentation adjustment ended there

9    wouldn't be this sudden --new sudden drop?

10  A  Yeah.  Again, I'm sorry, but from the segmentation

11    adjustment standpoint I'm not familiar with how it was used

12    or what this means.  You're going to have to talk to the

13    actuary about that.

14  Q  Okay, we'll do that.  Would you go to the next document 255.

15    Would you go to Bates Page --first of all, let me ask you,

16    have you got that?

17  A  255.

18  Q  That is a series of pages dealing with, in this case, the

19    2007 dividend scale, correct?

20  A  Yes.

21  Q  Mr. Zore, I want to advise you we have comparable sets of

22    documents for each year from 1986 forward and I don't want

23    to take the time this morning to go through every one of

24    them so I'm going to use this one, but feel free if you want

25    to ask about any other year.  I want to use this as kind of

1      an exemplar.

2                 In these annual --strike that.  Documents such as

3      these are generated annually by the people in charge of

4      determining dividends to present first to the management

5      committee at Northwestern and ultimately to the Board of

6      Directors on what the dividends for the upcoming year should

7      be; is that correct?

8   A  They make a recommendation, yes.

9   Q  And the board decides on the dividends?

10  A  That's correct.

11  Q  And they make recommendations as to life policies and there

12     are adjustments, there might be a different mortality even

13     among life policies, for example, so there's an adjustment

14     for that and expenses and such, correct?

15  A  Yes.   There are a lot of different single premium,

16     disability, long term care.  They're all different.

17  Q  And --but basically if --as long as it's based on what's

18     called a dividend interest rate, isn't it, for the general

19     life policies even now?

20  A  The dividend interest rate is the amount of money that's

21     thrown off by the investment portfolio.

22  Q  Okay.  Now, in the process of making these determinations

23     both by the actuarial staff and others that are charged with

24     developing the information for final dividend decisions and

25     going into the management committee which then considers it

```
 1          and then ultimately presents it to the board, a
 2          determination is made --has been made each year since 1986
 3          for the dividends, all dividends for the pre-MN series of
 4          annuities, correct?
 5     A    That is correct.
 6     Q    Would you turn to Bates Page 0952.  Here you have a
 7          description of the dividends that are recommended for the
 8          pre-MN series.  Do you see that?
 9     A    Yes.
10     Q    That refers to this as a closed block, a front-loaded
11          deferred annuities last issued in 1985.  That confirms we're
12          talking about the pre-MN annuities?
13     A    That's correct.
14     Q    And then it gives the amount of reserves in force for that
15          closed block of business.
16     A    That's correct.
17     Q    And then the recommendation in this particular year was no
18          change in dividend interest rate, correct?
19     A    That's correct.
20     Q    What is the meaning of the term "closed block"?
21     A    That means that the --that the product is not to be sold any
22          more.
23     Q    And that block consists of annuities that have been sold all
24          around the country?
25     A    That's correct.
```

```
 1  Q   And the determination then is made for the dividends to be
 2      provided to that block?
 3  A   That's correct.
 4  Q   Can you confirm for us that an equivalent determination was
 5      made in each of the years from 1986 forward for this closed
 6      block?  I don't mean the numbers were the same but the same
 7      kind of determination was made.
 8  A   I wasn't an actuary so I can't --I can't say if it was or
 9      wasn't.  I assume it was but --
10  Q   --Well, let me ask you this:  Throughout the time you were
11      on the Board of Trustees and particularly the time you were
12      president --
13  A   --I was on the Board of Trustees since 2000.
14  Q   And you still are, aren't you?
15  A   Yes.
16  Q   Okay.  In each of those years --strike that.  You were part
17      of the management committee before that, were you not?
18  A   I started in, I think, 1990.
19  Q   Okay.  For all of those years an equivalent determination
20      was made by the management committee and then the board for
21      the pre-MN series deferred annuities in the sense it was
22      made for this closed block, right?
23  A   I believe so.
24  Q   And you've already testified these have been sold nationwide
25      only when the determination was made as to the whole block,
```

```
 1        correct?

 2   A    Yes.

 3   Q    It was not made, for example, as to just an individual

 4        annuitant or annuitants from a certain section of the

 5        country or state, correct?

 6   A    No.  Yes.

 7   Q    It was made nationally?

 8   A    Yes, yes.

 9   Q    In fact, all of the work that you did in the segmentation

10        process and thereafter including voting on dividends all

11        dealt with this closed block as a national block of

12        annuitants?

13   A    There was one block of business.

14   Q    One block of business, and all of the activities that I

15        questioned you about today relate with that block as a

16        block, correct?

17   A    That's correct.

18             MR. KERSTEN:  Your Honor, may I consult briefly

19        with co-counsel?

20             THE COURT:  Certainly may.

21             (Off the record.)

22             MR. KERSTEN:  Your Honor, that completes the

23        questioning of this witness.

24             THE COURT:  Cross.

25             MR. VAN VUGT:  Thank you, Your Honor.
```

 *Quarles & Brady* LLP

411 East Wisconsin Avenue
Milwaukee, Wisconsin 53202-4497
Tel 414.277.5000
Fax 414.271.3552
www.quarles.com

*Attorneys at Law in:*
*Phoenix and Tucson, Arizona*
*Naples and Boca Raton, Florida*
*Chicago, Illinois*
*Milwaukee and Madison, Wisconsin*

Direct Dial: (414) 277-5377
E-Mail: cristina.hernandez@quarles.com

June 17, 2010

**VIA ELECTRONIC AND U.S. MAIL**

George Kersten, Esq.
Kersten & McKinnon, S.C.
11518 N. Port Washington Road, Suite 104
Mequon, WI 53092

> RE:   **LaPlant, et al. v. The Northwestern Mutual Life Insurance Company**
>        **Case No. 08-CV-011988**

Dear George:

Per your discussion yesterday with Eric Van Vugt, Northwestern Mutual gives the following response to Notice of Deposition directed to it dated June 11, 2010:

Northwestern Mutual does not contend that the terms of the annuity contract were altered or amended by communications between Northwestern Mutual agents and Class members. Northwestern Mutual agrees that the annuity contract itself prohibits oral modification by an agent and the agents' contracts prohibit agents from modifying the annuity contracts. Northwestern Mutual contends that the terms of the annuity contracts are unambiguous (in permitting the 1985 Change), and does not intend to rely on statements made by or to policyowners to prove that the contractual language was modified. Northwestern Mutual does contend, however, that a substantial number of Class members learned about the 1985 Change from their agents, dividend statements and other sources, and that their claims are therefore barred in whole or in part by the doctrines of waiver, estoppel, laches and the applicable statutes of limitation.

Sincerely,

**QUARLES & BRADY LLP**

Cristina D. Hernandez

cc:   Eric J. Van Vugt, Esq.
       Mark Schirmer, Esq. (via overnight mail)

QB\10637645.1

STATE OF WISCONSIN         CIRCUIT COURT        MILWAUKEE COUNTY

CATHERINE D. NOONAN and
DANIEL A. NOONAN,

                          Plaintiffs,          Declaratory Relief
                  vs.                          Case Code:   30301

THE NORTHWESTERN MUTUAL LIFE          Case No. 01 CV 12349
INSURANCE COMPANY, et al.,

                          Defendant.

---

**AFFIDAVIT**

---

STATE OF WISCONSIN )
                   ) ss.
MILWAUKEE COUNTY )

     Michael J. Holden avers under oath of his personal knowledge as follows:

     1.    I reside at 4633 N. Morris Blvd., Whitefish Bay, Wisconsin, 53211, and am now retired.

     2.    My career throughout my adult life, from June 1, 1957 to October 23, 2006, has been to be an insurance agent for the Northwestern Mutual Life Insurance Company, a Wisconsin mutual life insurance company, now known as the Northwestern Mutual Financial Network ("NML"). During my career I was licensed as an NML insurance agent in substantially all states in the United States (other than Alaska and Hawaii) and I am fully familiar with NML's agent network.

PLAINTIFF'S EXHIBIT

3.     Attached hereto as Exhibit A is a true copy of my most recent "Senior Agent Contract" setting forth my authority, duties and rights as an NML agent. To my best knowledge, recollection and belief, my agent contracts with NML ever since I joined NML all contained substantially the same provisions as in ¶¶ 4, 5 and 6 of Exhibit A hereto.  As demonstrated in Exhibit A, ¶ 6, NML agents are "captive agents," not "independent agents."  Although they are independent contractors rather than employees (*see*, Exhibit A, ¶ 4), they are subject to restrictions in ¶ 6, which makes them captive agents rather than independent agents.

4.     Because of ¶ 5 in Exhibit A (and equivalent provisions in all prior contracts) I am aware of no basis on which any conversations, dealings or exchange of information between any NML agent and a potential purchaser of an NML annuity (or other policy) could or would vary the written terms or meaning of any annuity or other policy issued by NML.

5.     The standard applications which customers sign in applying for an annuity or other policy provide that no such conversations, dealings or exchange of information (either prior to or at the time of sale, application for the policy or issuance of the policy or at any other time) can vary or change the meaning of the written language of the annuity or other policy.

6.     I have been advised that the subject of the above entitled action is that NML in 1985 made a change in the way it provided or determined dividends to be credited to

2

annuities sold by NML prior to March 1985, and that in that respect NML contends it was the agents' job to inform annuitants of that change. That contention simply is not true. If there were any change, including the one just referred to, it would not be and could not be the agents' job to communicate that to the annuitants. The structure of NML's agency system and the varying degree of contact, if any, agents have with policyholders throughout the country would prohibit that from being either the understanding or expectation of either NML or the agents in that regard. To the contrary, I and any other agent would understand that disclosures and descriptions of any such changes, if permitted by law, would be made directly by NML's home office to annuitants and other policyholders.

Dated at Milwaukee, Wisconsin this 30th day of April, 2007.


_____
Michael J. Holden


Subscribed and sworn to before me
this 30th day of April, 2007.

_____
Notary Public, Milwaukee County
State of Wisconsin
My commission is permanent

3

  "Exhibit A"  

# SENIOR AGENT CONTRACT

## Northwestern Mutual Life

720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

MICHAEL FORMELLA

(General Agent)
(District Agent)

of The Northwestern Mutual Life Insurance Company, hereinafter called "First Party," and

MICHAEL J HOLDEN                    of WHITEFISH BAY                    , in the County of

MILWAUKEE          , and State of          WI          , hereinafter called the "Agent," agree as follows: :

**1. Effective Date** — This agreement shall take effect on MAY 01, 1999

### AUTHORITY OF AGENT

**2. Territory** — Agent is hereby appointed Senior Agent and may solicit Applications for insurance policies and annuity contracts issued by The Northwestern Mutual Life Insurance Company (the "Company") within

See page 5

(the "Territory").

**3. Solicitation Outside of Territory** — Whenever Agent wishes to solicit an Application in an area outside the Territory he must first secure through the Company an agent's license from the proper state authority. Solicitation outside the Territory shall be governed by regulations of the Company as from time to time published and amended.

**4. Relationship** — Agent shall be an independent contractor and nothing herein shall be construed to make Agent an employee of the Company, General Agent or First Party. Agent shall be free to exercise his own judgment as to the persons from whom he will solicit Applications and the time, place and manner of solicitation, but the Company from time to time may adopt regulations respecting the conduct of the business covered hereby, not interfering with such freedom of action of Agent.

**5. Alteration of Policies** — Agent shall have no power, personally or on behalf of the Company or First Party, to waive any forfeiture or to alter or discharge or waive any of the terms and conditions of any policy or contract.

**6. Exclusive Dealing** — (a) Agent shall do no business for any other company which issues annuity contracts or life insurance or disability income insurance policies except in connection with Applications with respect to persons who are then insured by the Company to the limit which it will issue on them or who are otherwise not acceptable for insurance by the Company or who have been found by the Company to be insurable only at higher than standard premium rates which are unacceptable to the appli- cants.

(b) The requirement of 6(a) is waived for Applications for life insurance policies solicited by Agent if his present term of service commenced prior to January 1, 1956, pro- vided any such Application is for insurance acceptable to the Company only at rates higher than the standard rates.

**7. No Brokerage** — Agent shall not accept business from, nor pay any commissions or other remuneration therefor to, any other person.

### DUTIES OF AGENT

**8. General Duties** — Agent may solicit Applications for insurance policies and annuity contracts but shall be subject to no minimum production requirements since he is not a full time life insurance salesman. Agent shall collect the initial premiums on policies and contracts issued on Applications submitted by him.

**9. Responsibility** — Agent shall be responsible to First Party and the Company for all business done by or entrusted to his agents or persons employed by him. He shall indemnify and save First Party, General Agent and the Company harmless from any and all expenses, costs, causes of action and damages resulting from or growing out of acts or transactions by himself or his employees or agents.

**10. Remittances** — Agent shall be responsible to the General Agent, First Party and the Company for all amounts received for the account of the Company. General Agent or First Party by him, his employees or his agents. All such amounts, and any promissory notes taken in payment of initial premiums on prepaid Applications, shall be deposited with First Party.

**11. Records** — Agent shall hold and preserve all records relating to transactions by or for the Company, and all other property of the Company which at any time shall come into his possession or under his control, and shall surrender them to the Company or First Party upon demand.

**12. Bond** — Agent shall maintain a fidelity bond acceptable to the Company.

**13. Expenses** — Agent shall pay all expenses incurred by him in the performance of this agreement.

**14. Conduct** — Agent shall comply with all applicable laws and regulations and shall so conduct himself as not to affect adversely the business, good standing or reputation of himself, First Party or the Company.

**15.** Confidential Materials — Agents' training, Agency development and sales promotion materials and other items labeled "Confidential - Not for Publication" are furnished to Agent in confidence, and Agent agrees that he shall refrain from publishing or disclosing such material other than in the ordinary course of his business and that such items shall be returned to the Company upon demand or upon termination of this agreement.

## COMMISSIONS AND FEES

**16.** Schedules — (a) First Party shall pay commissions to Agent at the rates, and subject to the regulations, set forth in the Standard Senior Agents' Commission and Fee Schedule (Former Full Time Agents) (Former Part Time Agents) published by the Company from time to time in effect on the date of Part I of the Application for the policy or contract with respect to which the commissions are to be paid.

(b) The Company reserves the right to change the above Commission Schedule in whole or in part, subject to the following limitations:

(i) No such changes shall operate to reduce the first year, additional or renewal commissions payable on any policy or contract theretofore issued.

(ii) The Company shall give Agent not less than 30 days' advance written notice of the effective date of any reduction in commission rates, unless immediate change is required by statute or by administrative order of any governmental regulatory authority.

**17.** Beneficiaries — Agent shall have the right to designate beneficiaries to receive commissions, fees and other remuneration accrued at his death and thereafter accruing. Any such designation of beneficiaries shall be subject to the following provisions:

(a) CLASSES — Beneficiaries shall be of the same classes as provided in life insurance policies of the series issued by the Company on the date of this agreement.

(b) SUCCESSION — The succession in interest of the beneficiaries shall be as stated in the Settlement Option Provisions of life insurance policies of said series. If no beneficiary is designated or if no beneficiary survives Agent, amounts accrued at Agent's death and thereafter accruing shall be paid to his executor or administrator or to the persons entitled thereto under applicable law.

(c) WHEN EFFECTIVE — All designations, revocations and changes in beneficiaries shall be duly made in writing and shall be effective upon receipt at the Home Office of the Company.

(d) ASSIGNMENT — No assignment by Agent of his rights hereunder shall require the consent of any beneficiary, and the interest of any beneficiary shall be subject to any such assignment.

## TERMINATION

**18.** Term of Agreement — This agreement shall terminate upon the first to occur of the following:

(a) The death of Agent;

(b) If First Party is a General Agent, termination of the present contract between the General Agent and the Company; or

(c) If First Party is a District Agent, termination of his contract with General Agent (except as such contract may be extended through an Endorsement by the Company in which case this agreement shall automatically terminate upon expiration of the extension).

It may be terminated by First Party upon written notice to Agent, by reason of:

(i) Legislation, court decision or insurance department or other governmental ruling or requirement which in the opinion of the Company either contravenes any provision of this agreement or renders it expedient for the Company to withdraw from the whole or any part of the Territory; or

(ii) Failure of Agent to comply with any of the terms hereof.

It may be terminated by either party at any time, without cause, upon thirty days' written notice.

**19.** Commissions After Termination — (a) If termination of this agreement was for violation of Paragraph 6, 7, 10 or 14 thereof, there shall be deducted from all commissions otherwise payable on renewal premiums collected after such termination 1% of such premiums.

(b) Except as set forth in subparagraph (a) above, Agent's right to commissions shall not be affected by termination of this agreement.

## GENERAL

**20.** Setoff — First Party, General Agent or the Company may at any time set off against any commissions or other remuneration due to or to become due under this or any prior agreement to Agent or anyone claiming through or under him, any debt or debts due from Agent to First Party, General Agent or the Company.

**21.** No Waiver — No forbearance or neglect on the part of First Party, General Agent or the Company to enforce any of the provisions of this agreement shall be construed as a waiver of any of his or its rights hereunder, or affect his or its rights arising from any default or failure of performance by Agent.

**22.** Notice — Any notice required by this agreement shall be in writing, and shall be delivered in person or by mail to the party at his last known post office address.

**23.** No Assignment — This agreement is not transferable. Except for the designation of beneficiaries as provided in Paragraph 17, no rights or interests arising hereunder shall be assignable without the Company's prior written consent.

**24.** Definitions — The following terms shall have the indicated meanings:

(a) APPLICATION — an application to the Company for an annuity contract, a life insurance policy, or disability income insurance policy.

(b) CONTRACT YEAR — a period of one year commencing on the effective date of this agreement or any anniversary thereof.

(c) SOLICITOR — the person under an Agency contract in effect on the date of Part I of an Application solicited by him whose signature appears on the Agent's certificate of such Application.

2

606

25.   Interpretation — This agreement shall not become effective until approved by the Company at its Home Office in Milwaukee, Wisconsin and shall be governed by and construed in accordance with the laws of the State of Wisconsin. If First Party or General Agent is a partnership, the words "he," "his" and "him" shall be understood to refer to the partnership unless it is apparent that they are used in a different sense.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the effective date set forth above.

First Party    General Agent                                                          Senior Agent
               District Agent

ENDORSEMENT
(To be executed if First Party is a District Agent)

The undersigned General Agent hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder whenever the contract between General Agent and First Party is terminated.

District Agent                                                                         General Agent

ENDORSEMENT BY COMPANY

The Company and Agent hereby agree as follows:

A.   Cashiership — If the above contract is terminated by reason of the termination of General Agent's contract with the Company, then Agent, if First Party is General Agent, without further act or notice may continue to solicit and procure Applications for policies and contracts and submit them to the representative appointed by the Company until the effective date of a General Agent's Contract between the Company and a successor General Agent.   Commissions and other remuneration payable on any policies and contracts issued on such Applications written during such interim, shall be upon the terms and conditions stipulated in the above agreement.

B.   Compensation — The Company hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder, whenever the contract between the General Agent and the Company is terminated.

C.   Limitation of Liability — The Company shall not be liable to Agent in any manner, except as specifically set forth in this Endorsement.

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

                                                    By
Senior Agent                                              SENIOR VICE PRESIDENT - AGENCIES

90-1640(11/93)                        3

STATE OF WISCONSIN   CIRCUIT COURT   MILWAUKEE COUNTY
                         BRANCH 36
--------------------------------------------------------

MARLEEN M. LaPLANT,

        Plaintiff,

     vs.              CASE NO. 08-CV-011988

NORTHWESTERN MUTUAL                    **COPY**
LIFE INSURANCE COMPANY,

        Defendant.

--------------------------------------------------------

                  COURT TRIAL
                    (P.M.)

--------------------------------------------------------

        BEFORE THE HONORABLE DENNIS FLYNN,
     CIRCUIT COURT RESERVE JUDGE PRESIDING
                NOVEMBER 8, 2010


             A P P E A R A N C E S:

GEORGE KERSTEN, CAMPION KERSTEN, KENAN KERSTEN, JEFFREY
BARTOS, TIMOTHY BATIN, CHRISTOPHER LEE, MARK POLLACK,
MARIA LAZAR, Attorneys at Law, appeared on behalf of
the Plaintiffs, Marleen M. LaPlant.

MARLEEN M. LaPLANT and JOHN LaPLANT, Plaintiffs,
appeared in person.

ERIC J. VAN VUGT, CRISTINA HERNANDEZ-MALABY and JOSHUA
MAGGARD, Attorneys at Law, appeared on behalf of the
Defendants.


                  BONNIE H. DOMASK
                Official Court Reporter

PLAINTIFF'S EXHIBIT

-1-

EXCERPT FROM FISHER TESTIMONY

```
 1    Q   Carol is saying that on April 10, 2000, I sent a link

 2        to your area asking you to give me a status on Dan

 3        Madigan's March 8, 2000 letter to you regarding

 4        Catherine D. Noonan's policy.  Have you contacted

 5        Mr. or Mrs. Noonan with a reply?  The agent's office

 6        has heard nothing.

 7             Then she goes on, I would appreciate a link or a

 8        phone call, etcetera.  Then below that, just read what

 9        is here at 4-17, the 17th day of April 2000.  Read what

10        that last paragraph says.

11    A   A George Akpan from annuity services left a voice mail

12        re this case.  He had to gather a lot of information on

13        this contract and the other contracts of the Noonan's

14        that NML services, if we will give them a little while

15        longer, he will have this case together and a letter

16        out to the annuitant.

17    Q   After Mr. Akpan did those things that he describes in

18        this voice mail, you're aware of the fact that he

19        authored this letter that is the next exhibit, 192; is

20        that true?

21    A   I think so, yes.

22    Q   Would you look at that again?  This has a number of

23        exhibit stickers on, but the lowest one in the

24        right-hand column you'll see is a Exhibit 6, January 6,

25        2005, when you were deposed in the Noonan lawsuit; do
```

1       you follow that?

2     A   I think I'm with you.

3     Q   Okay.   Do you recall then being asked about this letter

4         of Mr. Akpan's, correct?

5     A   Yes.

6     Q   Mr. Akpan is identified by the position he held in

7         Northwestern Mutual in the upper left-hand corner of

8         this document.  Would you just read what it says?

9     A   Customer Service Representative, Annuity

10        Administration -- Annuity and Accumulation Products

11        Department.

12    Q   Seeing that position that Mr. Akpan held, you would

13        recognize that one of his regular jobs was to

14        communicate with annuitants with respect to inquiries

15        made on behalf of the annuitants, correct?

16    A   Yes.

17    Q   You had occasion to read this letter back in the year

18        2000, didn't you?

19    A   Yes.

20    Q   It's correct to say, is it not, that Mr. Akpan did not

21        fairly and correctly describe the segmentation process

22        that in fact had occurred in 1985, right?

23    A   I recall I had a few -- he said a couple of things that

24        I didn't quite agree with.

25    Q   In other words, you testified earlier he just didn't

```
 1          get it, right?

 2    A     Right.

 3    Q     Right?

 4    A     Right.

 5    Q     You're aware of the fact then that by virtue of the

 6          next exhibit, 193, Daniel Noonan upon receiving the

 7          Akpan letter sought to get additional information to

 8          try to find out what actually had happened in this

 9          respect, correct?

10    A     Yes.

11    Q     And the person that ultimately responded pursuant to

12          the request for follow-up information set forth in 193,

13          the person that responded to that was you, is it not?

14    A     I think that's correct.

15    Q     And that's your letter of May 9, 2000, that is trial

16          Exhibit 194 here today?

17    A     Correct.

18    Q     I'm going to ask you a couple of questions about that

19          letter, Mr. Fisher.

20    A     Okay.

21    Q     Do you recall again testifying about this at your 2005

22          deposition?

23    A     Oh, yeah.

24    Q     Okay.  Now, with regard to the segmentation, go to the

25          last paragraph on the first page, if you would.
```

1

# **Affidavit of Robert L. Hoyer**

STATE OF FLORIDA )
                   )   SS
COLLIER COUNTY )

1. I am currently, and have been since 2002, the principal of Hoyer Actuarial Litigation, LLC. I am a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries. I render litigation support and expert witness testimony on a wide range of insurance and health care matters.

2. I began my insurance career in 1971 with Aetna Life & Casualty (Aetna). I held a variety of positions at Aetna, and became an officer of the company in 1977.

3. In 1980, I joined Price Waterhouse, where I served as the Managing Partner of the national Actuarial Consulting Services Group.

4. In 1989, I joined Arthur Andersen as the Managing Partner of the national Actuarial Services group. At both of these firms, I was responsible for all actuarial work performed by actuaries in multiple locations throughout the United States.

PLAINTIFF'S EXHIBIT

1

2

5.   In my 40 years of insurance industry experience, I have rendered litigation support services in over 100 actions, and have rendered expert witness testimony in over 25 cases. A copy of my current resume is enclosed with this affidavit.

6.   Further, my knowledge and experience applies directly to the subject matter of the present dispute. For example, I have been engaged by numerous mutual life insurance companies regarding matters which involved policyholder dividends. My experience includes litigation support, actuarial analysis, and the rendering of expert opinions on two litigation actions related to the current dispute. In the case Noonan v. Northwestern Mutual Life Insurance Company ("NML"), I provided an Affidavit dated March 8, 2005, and in the case M. LaPlant vs. NML I provided an expert report dated June 30, 2010 and testified in court on November 16 and November 17, 2010.

7.   I have been retained on behalf of the plaintiffs and the proposed plaintiff class to serve as an expert consultant and potential expert witness in the case known as Krueger v. NML.

8.   Counsel for the plaintiffs has not provided me with any documents specific to this case, but the numerous documents I have reviewed related to the Noonan and

3

LaPlant cases allow me to provide certain analyses and perspective relative to the present case.

9.   Counsel asked me to consider, and opine as appropriate, to the following specific questions:

- Would it be feasible to compute the damages sustained by the block of Pre-MN Annuitants of a common fund or block basis as a result of the Change?

To this question my answer is "Yes."

- If so, what would be the basic methodology for doing so?

My answer to this question will be provided later in this affidavit.

- Assuming the damages sustained by the Pre-MN Annuities are computed on such a common fund or block basis, is it feasible to allocate the damages among the Pre-MN Annuitants without having an evidentiary trial as to each individual Annuitants damage amount?

To this question my answer is "Yes."

- If so, what would be the basic methodology for doing so?

4

My answer to this question will be provided later in this affidavit.

## Analysis

10. NML, in 1985, established a segregated asset portfolio to support the closed block of annuity policyholders in-force at that time (the Pre-MN Annuitants). They used this relatively short-term investment portfolio as the basis for subsequent policyholder dividends for the Pre-MN group. Prior to 1986, policyholder dividends for the Pre-MN group tended to be numerically comparable to dividends provided to life insurance policyholders, but since that time, dividends for these annuitants have tended to be less than those provided to life insurance policyholders.

11. NML, in disclosure of information during the LaPlant dispute, provided charts depicting the dividends rates each year since 1986 applicable to life insurance policyholders and those applicable to Pre-MN Annuitants. NML also provided the extent of actuarial reserves each year for the Pre-MN group. A quantification of damages would be determined as the cumulative sum of the annual difference in dividend rates applied to the corresponding annual reserve values.

5

12.  This calculation could be refined if additional information (all of which should be available to NML), were to be provided. Included in the nature of refinement would be the following:

- The percentages of life insurance and Pre-MN Annuitants who opted for "direct recognition" as part of "Update 1983."

- The percentages of life insurance and Pre-MN annuity cash values which were outstanding as policy loans each year since 1986.

- The life insurance and Pre-MN dividend rates each year since 1986 applicable to policy loan values.

If this information were made available, the basic methodology described above would be subdivided by category, but the overall approach would remain as indicated.

13.  The damages calculated above would be allocated to remaining Pre-MN Annuitants based on the percentage of their existing actuarial reserves to the sum of all such reserves.

14.  Again, this basic methodology could be refined if additional information were to be provided, including:

6

- The percentage of Pre-MN Annuitants who opted for direct recognition under Update 1983.

- Current cash values applicable for Pre-MN Annuitants.

- The extent of cash values outstanding as policy loans for Pre-MN Annuitants.

- Information as to lapsed or deceased policyholders at specified durations prior to the current date.

If this information were made available, the basic methodology described above would be subdivided by category, but the overall approach would remain as indicated.

I declare under penalty of perjury according to the laws of the State of Florida that the foregoing is true and correct.

Robert L. Hoyer
Fellow of the Society of Actuaries
Member of the American Academy of Actuaries
Principal
Hoyer Actuarial Litigation, LLC

January 7, 2011

State of Florida
County of Collier
Sworn before me this 7th day
of January 2011 by Robert Hoyer.

ANDREW E. BRACKEN
Notary Public, State of Florida
Commission# EE 31912
My comm. expires October 4, 2014

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NO. 322     HON. PETER D. LICHTMAN, JUDGE

NICHOLAS PAPADAKIS,                    )
                                       )
                 PLAINTIFF,            )
                                       )
        VS.                            )     NO. BC 322788
                                       )
NORTHWESTERN MUTUAL LIFE INS. CO.      )
                                       )
                 DEFENDANT.            )
                                       )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

FEBRUARY 22, 2006

APPEARANCES:

FOR THE PLAINTIFFS:        TIMOTHY J. MORRIS, ESQ.

FOR THE DEFENDANTS:        PHILLIP R. KAPLAN, ESQ.

REPORTED BY
REGIS TAYLOR, RPR, CSR 1287
OFFICIAL COURT REPORTER
STATE OF CALIFORNIA

COPY

COPYING RESTRICTED SEC. 69954 (d) GOV. CODE



EXHIBIT     1

Case 2:10-cv-06264-PSG -AGR   Document 8-2   Filed 09/17/10   Page 8 of 57   Page ID
#:170

3

1    STATES TWO THINGS.  ONE, IT STATES THAT A DIVIDEND

2    CHALLENGE TO THE DIVIDEND SYSTEM OF A MUTUAL

3    INSURANCE COMPANY DOES, IN FACT, IMPLICATE THE

4    INTERNAL AFFAIRS OF THAT COMPANY, MUCH AS A DIVIDEND

5    CHALLENGE WOULD BE TO A STANDARD CORPORATE

6    ENTERPRISE.

7           THE SECOND THING THAT IS KEY IN HILL TO

8    OUR MOTION IS THAT THE COURT LOOK BEYOND THE FRAMING

9    OF THE CAUSE OF ACTION.  WHETHER IN THAT CASE IT WAS

10   A CONTRACT CLAIM, AND A BREACH OF GOOD FAITH AND FAIR

11   DEALING, WHICH THE PLAINTIFFS ARGUED PREVENTED THE

12   MATTER FROM BEING AN INTERNAL AFFAIRS MATTER.  IT WAS

13   SIMPLY A LOCAL ACTION STATED ON THOSE THEORIES.

14          AND THE COURT SAID LOOK, IF THE ESSENCE

15   OF THE CLAIM IS TO INVOLVE THE COURT IN REANALYZING

16   AND INTERPRETING HOW A CORPORATION DOES ITS

17   DIVIDENDS, THAT IS A QUINTESSENTIAL INTERNAL AFFAIRS

18   MATTER.  SO IT IS GOVERNED BY THE LAW OF THE

19   DOMICILE.

20          WE THINK THAT IS IMPORTANT HERE BECAUSE

21   PLAINTIFF HAS DONE SOME OF THE SAME MOVES.  IT HAS

22   STYLED THESE DIVIDEND CHALLENGES DIFFERENTLY.

23   CONTRACT CLAIMS, FRAUD CLAIMS, DECEPTIVE ADVERTISING

24   CLAIMS.

25          BUT IN ESSENCE, AS WE POINTED OUT IN THE

26   PAPERS, EACH OF THE CAUSES OF ACTION REALLY DEPEND

27   UPON INVOLVING THE COURT IN A RE-EXAMINATION OF HOW

28   NORTHWESTERN MUTUAL DID DIVIDENDS THAT BRINGS US TO

COPYING RESTRICTED SEC. 69954 (d) GOV. CODE        3

EXHIBIT      1